No. 20-61019

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

CHARLES RAY CRAWFORD,
*Petitioner-Appellant,*

*v.*

BURL CAIN, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS;
EARNEST LEE, SUPERINTENDENT, MISSISSIPPI STATE PENITENTIARY,
*Respondents-Appellees*

Appeal from the United States District Court
for the Northern District of Mississippi
No. 3:17-cv-105

## RESPONDENTS-APPELLEES' BRIEF ON REHEARING EN BANC

LYNN FITCH
  *Attorney General*

JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
BRIDGETTE N. GRANT
  *Special Assistant Attorney General*
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: bridgette.grant@ago.ms.gov
*Counsel for Respondents-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

*s/ Bridgette N. Grant*
Bridgette N. Grant
*Counsel for Respondents-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument for September 19, 2023.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF AUTHORITIES........................................................ v

INTRODUCTION............................................................... 1

STATEMENT OF JURISDICTION........................................ 4

STATEMENT OF THE ISSUES................................................ 4

STATEMENT OF THE CASE ................................................. 5

    Factual Background ........................................................ 5

    Procedural Background.................................................. 15

SUMMARY OF ARGUMENT ................................................. 19

STANDARD OF REVIEW...................................................... 20

ARGUMENT ..................................................................... 21

I.    Petitioner's Ineffective-Assistance Arguments Targeting His Appellate Counsel Fail Under The Doubly Deferential Review That *Strickland* And § 2254(d) Demand ................................. 21

    A.    The Mississippi Supreme Court's rejection of petitioner's theory that appellate counsel should have raised an unpreserved and meritless expert-funding claim on direct appeal was objectively reasonable ........................................ 23

    B.    Petitioner's counterarguments lack merit............................ 28

II.    Petitioner's Alternative Trial-Counsel-Ineffectiveness Arguments Also Fail Under Doubly Deferential Review ................................. 35

A.  The Mississippi Supreme Court's rejection of petitioner's ineffective-assistance-of-trial-counsel claims was objectively reasonable ............................................................... 35

B.  Petitioner's attacks on trial counsel's strategic choices and investigatory decisions lack merit ........................................ 41

III.  Independently, This Court Should Reject Petitioner's Claims Because Law and Justice Do Not Require Granting Him Habeas Relief .................................................................................... 48

A.  This Court can require petitioner to satisfy a factual innocence requirement .......................................................... 48

B.  This Court should apply a factual innocence requirement as an independent ground to dismiss petitioner's claims ......... 59

CONCLUSION ...................................................................................... 61

CERTIFICATE OF SERVICE ............................................................... 62

CERTIFICATE OF COMPLIANCE ....................................................... 62

# TABLE OF AUTHORITIES

**Cases**

*Ady-Cazorla v. State,*
   309 So. 3d 1169 (Miss. Ct. App. 2021)................................................27

*Ake v. Oklahoma,*
   470 U.S. 68 (1985)..........................................................29, 30, 44, 45

*Barksdale v. Blackburn,*
   639 F.2d 1115 (5th Cir. 1981) (en banc).............................................52

*Beavers v. Balkom,*
   636 F.2d 114 (5th Cir. 1981)............................................................45

*Bell v. Cone,*
   535 U.S. 685 (2002)....................................................................22, 38

*Bouchillion v. Collins,*
   907 F.2d 589 (5th Cir. 1990).............................................................45

*Bousley v. United States,*
   523 U.S. 614 (1998)..........................................................................59

*Brecht v. Abrahamson,*
   507 U.S. 619 (1993)....................................................33, 50, 51, 55, 59

*Brown v. Allen,*
   344 U.S. 443 (1953).........................................................................50

*Brown v. Davenport,*
   142 S. Ct. 1510 (2022)..................................18, 48-51, 53, 55-57, 59, 60

*Calderon v. Thompson,*
   523 U.S. 538 (1998)..............................................................52, 56, 57

*Crawford v. Epps,*
   2008 WL 4419347 (N.D. Miss. Sept. 25, 2008)..................11-12, 14, 39

*Crawford v. Epps,*
   353 F. App'x 977 (5th Cir. 2008).......................................................14

*Crawford v. Epps,*
   531 F. App'x 511 (5th Cir. 2013)..................................................10, 14

*Crawford v. Mississippi,*
525 U.S. 1021 (1998) .......................................................................... 14

*Crawford v. Mississippi,*
543 U.S. 866 (2004) ............................................................................ 14

*Crawford v. Mississippi,*
136 S. Ct. 2527 (2016) ........................................................................ 15

*Crawford v. Mississippi,*
137 S. Ct. 2160 (2017) ........................................................................ 14

*Crawford v. State,*
716 So. 2d 1028 (Miss. 1998) ...................................................... 14, 37

*Crawford v. State,*
787 So. 2d 1236 (Miss. 2001) ..........................12, 25, 33, 36, 37, 43, 46

*Crawford v. State,*
867 So. 2d 196 (Miss. 2003) .............................................................. 14

*Crawford v. State,*
192 So. 3d 905 (Miss. 2015) .................................. 7, 10, 12, 15, 27, 48

*Crawford v. State,*
218 So. 3d 1142 (Miss. 2016) .................................... 12, 14, 39, 45, 47

*Danforth v. Minnesota,*
552 U.S. 264 (2008) ...................................................................... 49, 55

*Davila v. Davis,*
582 U.S. 521 (2017) ...................................................................... 23, 26

*Dunn v. Reeves,*
141 S. Ct. 2405 (2021) ........................................................................ 36

*Engle v. Issac,*
456 U.S. 107 (1982) ...................................................................... 51, 56

*Flores v. Lumpkin,*
72 F.4th 678 (5th Cir. 2023) .............................................................. 37

*Fry v. Pliler,*
551 U.S. 112 (2007) ............................................................................ 54

*Harrington v. Richter,*
562 U.S. 86 (2011) ......................................22, 23, 26, 42, 45, 46, 51, 55

*Herrera v. Collins,*
506 U.S. 390 (1993) ................................................................ 55, 56

*Holland v. Florida,*
560 U.S. 631 (2010) .......................................................... 49-50, 54

*Jackson v. Epps,*
447 F. App'x 535 (5th Cir. 2011) .............................................. 23

*Jones v. Hendrix,*
143 S. Ct. 1857 (2023) ............................................................. 58

*Kuhlmann v. Wilson,*
477 U.S. 436 (1986) .................................................................. 50

*Lockett v. Anderson,*
230 F.3d 695 (5th Cir. 2000) .................................................... 45

*McCleskey v. Zant,*
499 U.S. 467 (1991) ............................................................ 51, 56

*McQuiggin v. Perkins,*
569 U.S. 383 (2013) ............................................................ 54, 59

*Miller v. Dretke,*
420 F.3d 356 (5th Cir. 2005) .................................................... 44

*Miller-El v. Cockrell,*
537 U.S. 322 (2003) .................................................................. 55

*Moore v. Dempsey,*
261 U.S. 86 (1923) ................................................................... 60

*Morris v. Dretke,*
90 F. App'x 62 (5th Cir. 2004) ................................................. 60

*Munaf v. Geren,*
553 U.S. 674 (2008) ............................................................ 49, 58

*Ortiz v. Quarterman,*
504 F.3d 492 (5th Cir. 2007) .................................................... 20

*Parker v. State,*
273 So. 3d 695 (Miss. 2019) .................................................... 31

*Pinkney v. State,*
538 So. 2d 329 (Miss. 1988) .................................................... 27

*Profitt v. Waldron*,
831 F.2d 1245 (5th Cir. 1987)................................................. 45, 47, 48

*Ross v. State*,
954 So. 2d 968 (Miss. 2007) ............................................................27

*Schlup v. Delo*,
513 U.S. 298 (1995).................................................................. 49, 60

*Shinn v. Ramirez*,
142 S. Ct. 1718 (2022)................................. 47, 51, 52, 53, 58

*Smith v. Robbins*,
528 U.S. 259 (2000).................................................................. 26, 33

*Stone v. Powell*,
428 U.S. 465 (1976).............................................................. 50, 56, 57

*Strickland v. Washington*,
466 U.S. 668 (1984)................................................... *passim*

*Teague v. Lane*,
489 U.S. 288 (1989)...............................................................51

*Wainwright v. Sykes*,
433 U.S. 72 (1977)............................................................ 50, 51

*Williams v. Collins*,
989 F.2d 841 (5th Cir. 1993)........................................... 30, 31

*Williams v. Taylor*,
529 U.S. 420 (2000)...............................................................55

*Withrow v. Williams*,
507 U.S. 680 (1993)...............................................................50

## Constitutional Provision

U.S. Const., amend. IV................................................................50

## Federal Statutes

28 U.S.C. § 1291 .....................................................................4

28 U.S.C. § 2243 ......................................... 48, 49, 53, 55, 58

28 U.S.C. § 2244(b)(2)(B)...........................................................54

28 U.S.C. § 2254(d)........................................................ *passim*

28 U.S.C. § 2254(e)(2)(B) ............................................................... 54

**Federal Rule**

Fifth Circuit Rule 28.2.1 ................................................................. i

**Other Authorities**

The Federalist No. 39 (C. Rossiter ed. 1961) ........................................ 51

Henry J. Friendly,
    Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,
    38 U. Chi. L. Rev. 142 (1970)................................................... 57

**INTRODUCTION**

This Court should affirm the district court's denial of petitioner Charles Ray Crawford's habeas petition.

Over three decades ago, petitioner lured two teenage girls to his house with a story about ugly pictures. Once there, he led one of the girls inside, held a gun to her head, bound her with duct tape, and raped her. Then he went outside and attacked the other girl with a hammer. Petitioner turned himself in after spending the rest of that night running from the law with his rape victim. Later, while out on bond, petitioner kidnapped, raped, and murdered another young woman. He was subsequently tried in three separate trials for those crimes. This case concerns petitioner's conviction for rape in his second trial.

Petitioner's resourceful attorney took different approaches to the trials. At the first trial on the hammer assault, counsel put on an insanity defense supported by an expert who claimed that a bipolar disorder temporarily left petitioner unable to distinguish right from wrong during the attack. The jury rejected that theory. At the second trial for rape and kidnapping, counsel strategically chose to put on a factual defense and a temporary-insanity defense with testimony from petitioner and his friends and family. The jury partially credited that strategy; it acquitted petitioner on the kidnapping charge but convicted him of rape. Then at the third trial for capital murder, counsel tried another expert-bolstered

temporary-insanity defense. The jury convicted petitioner and condemned him to death.

Petitioner lost numerous ineffective-assistance challenges to his murder conviction and sentence at every level (including direct appeal, state post-conviction review, habeas review, and successive state post-conviction review). Then he challenged the rape conviction on state review, hoping to knock out an aggravator underpinning his death sentence. The Mississippi Supreme Court applied *Strickland v. Washington* to reject ineffective-assistance claims targeting his trial and appellate counsel. The district court denied habeas relief under section 2254(d) of the Antiterrorism and Effective Death Penalty Act (AEDPA), holding that the state supreme court reasonably applied *Strickland*. A panel of this Court unanimously affirmed. The panel added that petitioner failed to make a colorable showing of factual innocence that satisfied the law-and-justice requirement for federal habeas relief.

Both the district court and the panel were correct. First, petitioner's claim that his appellate counsel unlawfully failed to raise a claim for expert funding on direct appeal lacks merit. Appellate counsel's effort was neither *Strickland* deficient nor prejudicial, and certainly not so under section 2254(d)'s standard. The state-court record proves the alleged expert-funding error was unpreserved and was not so much stronger than the grounds appellate counsel raised on appeal such that

2

every reasonable jurist would conclude that counsel was unconstitutionally ineffective.

Second, petitioner's back-up arguments faulting his trial counsel's strategic choices also fail. Counsel reasonably crafted a factual and insanity defense supported by lay witnesses at the rape trial. That defense was sensible and partially successful. Counsel had already tried the hammer-assault case on an expert-backed insanity defense that blamed petitioner's bipolar disorder for his crime. And counsel had no reason to think that some other temporary-insanity theory that turned on neurological tests would prevail—petitioner's testing was normal when counsel developed his trial strategy. It does not matter what petitioner now claims that his post-conviction counsel's hired experts may say about tests performed decades after the rape trial. His trial counsel's strategy was reasonable in 1993 and not *Strickland* deficient or prejudicial.

Additionally, and independently, even assuming petitioner's ineffective-assistance claims could clear the doubly deferential *Strickland*-§ 2254(d) hurdle, he has not even attempted to show that law and justice compel this Court to award him habeas relief. Federal courts are authorized to adjust the scope of habeas based on equitable considerations. Chief among them is the State's powerful interest in punishing the guilty. Petitioner has not demonstrated an extreme

malfunction in the adjudicative process leading to his conviction and has made no showing that he did not actually commit his crime. Law and justice do not compel the extraordinary remedy of habeas in this case.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 2254. On October 9, 2020, the district court entered final judgment denying petitioner's claims and later issued a certificate of appealability. ROA.989, 996-998. Petitioner filed a notice of appeal on October 30, 2020. ROA.999-1000. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

## STATEMENT OF THE ISSUES

Did the Mississippi Supreme Court reasonably apply *Strickland v. Washington* in rejecting petitioner's claim that his appellate counsel failed to raise an unpreserved and otherwise meritless expert-funding issue on direct appeal?

Did the Mississippi Supreme Court reasonably apply *Strickland* in rejecting petitioner's challenge to his trial counsel's sensible defense strategy that partially succeeded at trial?

Does federal law compel habeas courts to grant petitioner relief from his rape conviction absent a colorable claim of his factual innocence?

## STATEMENT OF THE CASE

**Factual Background**. In 1991, petitioner attacked sixteen-year-old Nicole Cutberth with a hammer and raped seventeen-year-old Kelly Roberts. Then, while out on bond, petitioner kidnapped, raped, and murdered twenty-year-old Kristy Ray. This habeas case involves petitioner's conviction for raping Kelly in the second of his three state trials.

On April 13, 1991, Kelly (petitioner's ex-sister-in-law) and her friend Nicole asked petitioner for help with their car. ROA.1546. While assisting the girls, petitioner initiated a scheme to lure them to his house. ROA.1547.

Petitioner told Kelly that he needed to talk to her about something but refused to elaborate. ROA.1547-1548. Petitioner later proposed that they meet at a cemetery near Walnut, Mississippi. ROA.1547-1548. At the cemetery, petitioner told Kelly that her boyfriend had "ugly pictures" of her. ROA.1549-1550. Petitioner claimed that the photos were at his house and convinced the girls to ride there with him. ROA.1550-1551. On the way, petitioner told the girls to "slouch down" when they passed a school so nobody could see them. ROA.1551. When they got close to his home, petitioner parked by a nearby abandoned building. ROA.1552-1553. Petitioner instructed Nicole to stay there while he and Kelly went to his house. ROA.1553. Once inside, petitioner told Kelly to wait while

5

he confirmed that the house was empty. ROA.1553. Petitioner said, "I'll go get the pictures." ROA.1553. He returned with a gun and put it to Kelly's head. ROA.1554.

Petitioner instructed Kelly to stay quiet, duct taped her mouth and hands, and forced her through the house and onto a bed. ROA.1554-1555. Kelly loosened the tape over her mouth enough to plead that she was on her period. ROA.1555. Petitioner undressed her, removed her tampon, and raped her. ROA.1556-1557.

Kelly then begged petitioner not to hurt Nicole. ROA.1557. But petitioner went outside and attacked Nicole with a hammer. ROA.1557-1558. Petitioner then returned and told Kelly they had to leave. ROA.1557. At the truck, Kelly saw a hammer in petitioner's hand, but Nicole was gone. ROA.1558. Petitioner said that he hit Nicole and that she ran away. ROA.1558. Kelly pleaded with petitioner not to hurt her. ROA.1558. Petitioner later untaped Kelly, gave her his gun, and told her to shoot him. ROA.1558-1559. After Kelly refused, petitioner complained, "I can't go back to jail." ROA.1560. Then he said that he needed to see Janet (petitioner's ex-wife and Kelly's older sister) who lived in Memphis. ROA.1560. Petitioner asked Kelly to go with him. ROA.1560. Kelly complied because she was afraid that petitioner might hurt Janet. ROA.1560-1561.

6

Petitioner drove toward Memphis on back roads and stopped along the way to ask a friend for a car because he knew the law was looking for him. ROA.1561-1562. The friend refused. ROA.1562. Petitioner drove to another friend's house and asked to borrow a truck because "he was running from the law." ROA.1562. That friend and his wife agreed to drive them to Memphis. ROA.1563. After arriving at a motel that night, petitioner slept at the foot of the bed and held Kelly's foot to prevent her escape. ROA.1566.

Back in Mississippi, officers received a report of petitioner's attack on Nicole. ROA.1495. Nicole reported that Kelly was at petitioner's house and needed help. ROA.1496, 1609. Inside the house, officers found a used tampon, a roll and strip of tape with hair, and blood on the stairs. ROA. 1499, 1501-1503, 1610. The hair matched Kelly's and petitioner's known hair samples. ROA.1531-1533.

The next day, petitioner turned himself in to Memphis police. ROA.1596-1597. He was later indicted separately for raping and kidnapping Kelly and for assaulting Nicole. *Crawford v. State*, 192 So. 3d 905, 909 (Miss. 2015).

In April 1992, petitioner's initial trial counsel (William Fortier) filed a motion for funds to hire Dr. L.D. Hutt to assist with an insanity defense. ROA.1040-1050. Hutt reviewed petitioner's medical history, information from counsel, and statements from petitioner's relatives and

friends. ROA.1043. Hutt preliminarily concluded that petitioner had symptoms of "Bipolar Affective Disorder." ROA.1043. Hutt further stated that petitioner's "long-term dependence upon chemical substances might also have influenced his ability to perceive … wrongfulness" and that petitioner may "[p]erhaps" have "more severe psychological disorders." ROA.1043.

Later that month, the trial court conducted the first pre-trial hearing involving expert issues. ROA.2036-2077. Counsel requested that the court appoint Hutt as petitioner's expert. ROA.2060-2061. The prosecutor argued that petitioner was not automatically entitled "to choose a psychiatrist of his personal liking or to receive funds to hire his own" and moved for a court-ordered examination. ROA.2064. The trial court needed more information to resolve the motions and *sua sponte* ordered a local mental-health facility to make a preliminary assessment. ROA.2068-2069. The court wanted that "preliminary report" to "see where we are," and he continued the matter "without prejudice to further motions from either side for examination or for funds." ROA.2069.

In September 1992, the trial court learned that a social worker had evaluated petitioner (and not a psychologist or psychiatrist as ordered). ROA.2079, 2092.; *see* ROA.2897-2899. Thus, the court had not "reached" the "point" to rule on "whether or not" petitioner was "entitled to have an expert." ROA.2096. The court explained that it had not "heard anything"

8

yet to "indicate" that petitioner "has a problem." ROA.2096. So the court ordered an examination at the State Hospital. ROA.2097. The court added that the parties should "confer" and said, "if you want to pursue having him examined, I'll give you an order" "but I'm going to have him examined at the state hospital." ROA.2097. Petitioner's counsel responded: "when we receive that report, I still have the right to come back and argue that he has a right to a psychiatrist for his defense." ROA.2097. The trial court confirmed: "That's right." ROA.2097.

A month later, the parties disputed language in the court-examination order on disclosure of Hutt's assessments. ROA.2099-2114. Counsel resisted because he had not "made" a "determination" on a trial expert. ROA.2110. He also had not yet seen Hutt's report and insisted it would not be discoverable unless "he's going to use [that] expert." ROA.2110. The parties eventually agreed on the form of an amended order. ROA.1101-1105.

In December, the State Hospital issued its report. ROA.1131-1136. A psychologist (Lott) and a psychiatrist (McMichael) concluded that petitioner was competent to stand trial, his claimed memory deficits were not credible, he was likely malingering alleged deficits, and he could distinguish right from wrong at the time of his crimes. ROA.1135-1136.

On January 29, 1993, while out on bond, Petitioner broke into 20-year-old Kristy Ray's home and kidnapped, raped, and murdered her.

*Crawford v. Epps*, 531 F. App'x 511, 512-14 (5th Cir. 2013). He later detailed the events leading to the murder and led authorities to Kristy's body in the woods. *Id.* at 513-14.

On February 1, petitioner's counsel moved to withdraw from the assault (Nicole) and rape/kidnapping (Kelly) cases. ROA.1106-1108. Counsel no longer believed in insanity or innocence theories and thought "all" of petitioner's crimes were "cold-hearted, calculated, and premeditated." ROA.1107. Due to competency concerns after Kristy's murder, the parties agreed to a second evaluation at the State Hospital. ROA.1360-1361.; *see* ROA.1109-1111. The next day, Lott and McMichael evaluated petitioner and found him competent. ROA.1369-1387. The trial court permitted petitioner's counsel to withdraw and appointed new counsel (James Pannell) in all three cases. ROA.1143. A few days later, the trial court conducted a competency hearing and ruled petitioner competent to stand trial. *See* ROA.1366-1387.; *Crawford*, 192 So. 3d at 909-11.

In March, the expert-funding motion came up again. ROA.1392. Petitioner's counsel told the court that the motion was "moot" on the assault case, ROA.1392., even though it was "still the Defense's intention to use the insanity defense in that case," ROA.1405. Then the parties argued about consolidating the assault and kidnapping/rape cases. ROA.1402-1408. Petitioner's original counsel sought consolidation,

10

ROA.1402., but his second counsel disagreed and was "becoming more and more convinced" to try the rape/kidnapping case "strictly on its merits" without an "insanity defense," ROA.1405-1406. When questioned on that approach, counsel explained "different lawyer, different defense." ROA.1408. The court then asked: "if I'm hearing you correctly, you're going to withdraw all your motions that are inconsistent with the position you're now taking[?]" ROA.1408. Petitioner's counsel confirmed: "Yes, sir." ROA.1408.

After the March hearing, counsel never again raised the expert-funding issue. And the trial court never issued an order denying the funding motion.

On May 17 (the day before the assault trial), Hutt attested that there was a "probability" that petitioner was "incompetent to stand trial." ROA.3011.; *see* ROA.3008-3011. Hutt (among other things) speculated that petitioner's recent "seizures could possibly be caused by organic brain damage resulting from a severe head injury he suffered in his late teens." ROA.3009. Hutt continued: "To discern the presence of organic brain damage, neurological testing in the form of an E.E.G. should be performed. I am told that such a test has been performed on [petitioner], but I have not seen the results." ROA.3009. It turns out that testing disproved Hutt's "organic brain damage" theory. The May 1993 E.E.G. showed no brain damage. ROA.3039.; *see also Crawford v. Epps*, 2008 WL

11

4419347, at *50 (N.D. Miss. Sept. 25, 2008) (E.E.G. performed on May 4, 1993 was "normal"); *Crawford v. State*, 218 So. 3d 1142, 1158 (Miss. 2016) (rejecting Hutt's speculation on "organic brain damage").

On May 18, the assault case went to trial. At a pre-trial competency hearing, petitioner testified and submitted affidavits from Hutt and Dr. Mark Webb on the "effect" of petitioner's medication on "his competency." *Crawford v. State*, 787 So. 2d 1236, 1240, 1242 (Miss. 2001). The court ruled him "competent to stand trial." *Id.* at 1240. At trial, petitioner relied solely on an expert-backed insanity defense. *Ibid.* Hutt testified that when petitioner attacked Nicole he "was suffering from a bipolar disorder, manic type" and that petitioner could not "differentiate between right and wrong." *Ibid.* (quotations omitted). The prosecution's rebuttal experts (McMichael and Lott) refuted Hutt's opinion. *Ibid.* The jury deliberated for "forty minutes" and found petitioner guilty. *Id.* at 1241.

On August 3, petitioner stood trial on the rape/kidnapping charges. *See Crawford*, 192 So. 3d at 910-11. Instead of using his assault-trial strategy, counsel employed a factual defense (that Kelly consented, or they never had sex, and that she was never captive) and an insanity defense supported by lay-witness testimony. ROA.1489-1493. Petitioner's mother and an ex-wife testified about his mental-health history. ROA.1646-1687. The friends who drove petitioner and Kelly to Memphis testified that they appeared to be "boyfriend and girlfriend" and

that Kelly showed no signs of rape. ROA.1626.; *see* ROA.1622-1645. Petitioner also testified and claimed that he had no memory of the rape. ROA.1701-1704. He recalled some earlier events that day, asking Kelly to shoot him, and fleeing to Memphis. ROA.1701-1704. But when asked if he raped Kelly, petitioner said: "I'm not going to lie and say I didn't, and I'm not going to turn around and lie and say that I did, because I don't know." ROA.1703.

On rebuttal, prosecutors called Dr. Stanley Russell (petitioner's then-treating physician) and McMichael (who had testified at prior competency hearings and the assault case). ROA.1729-1767. Russell testified that petitioner suffered from "adjustment disorder with depressed mood" and a "personality disorder," but those conditions "do not deviate his responsibility for behavior." ROA.1743. Russell also testified he had not discovered any "physiological organic cause" for petitioner's "alleged seizures." ROA.1733. He had scheduled testing that might explain a "seizure disorder" or "periods of alleged amnesia" but a "C.T. scan" had already come back "normal" and an "E.E.G." scheduled for the prior week had not occurred. ROA.1732-1733.; *see* ROA.3061. McMichael testified, based on prior evaluations, that petitioner was "malingering" or "faking or exaggerating symptoms of amnesia." ROA.1760.; *see* ROA.1760-1767. He diagnosed petitioner with a personality disorder. ROA.1760-1761. McMichael added that "none" of

13

petitioner's "diagnoses would rise to the level of something that would cause him truly not to know what he's doing." ROA.1761.

The jury found petitioner guilty of rape but not guilty of kidnapping and could not agree on a life sentence for the rape. ROA.1250. The trial court later sentenced petitioner to a 46-year term. ROA.1253-1254.

At petitioner's capital-murder trial (Kristy) in April 1994, counsel pursued an insanity-only defense and mitigation arguments supported by experts. *Crawford*, 531 F. App'x at 514-15. The jury convicted petitioner on all charges and returned a death sentence. *Id.* at 515. Courts at every level thereafter denied petitioner's direct appeal, state post-conviction efforts, and habeas petitions attacking his convictions and sentences. *See id.* at 517-22; *see also Crawford v. State*, 716 So. 2d 1028 (Miss. 1998), *cert. denied*, 525 U.S. 1021 (1998); *Crawford v. State*, 867 So. 2d 196 (Miss. 2003), *cert. denied*, 543 U.S. 866 (2004); *Crawford v. Epps*, 2008 WL 4419347 (N.D. Miss. Sept. 25, 2008); *Crawford v. Epps*, 353 F. App'x 977 (5th Cir. 2009); *Crawford v. State*, 218 So. 3d 1142 (Miss. 2016), *cert. denied*, 137 S. Ct. 2160 (2017). Those decisions repeatedly rejected ineffective-assistance claims targeting petitioner's trial counsel, including arguments that counsel failed to adequately investigate petitioner's sanity and mitigation defenses. *E.g.*, 2008 WL 4419347, at *32-54; 353 F. App'x at 990-94; 218 So. 3d at 1154-60.

14

**Procedural Background**. Appellate counsel raised several issues on direct appeal from petitioner's rape conviction, including that petitioner lacked counsel at a critical stage (the competency evaluation after he murdered Kristy), that the jury was improperly instructed, and that officers unlawfully searched petitioner's home after the rape. *Crawford*, 192 So. 3d at 912-26. The Mississippi Supreme Court affirmed petitioner's rape conviction by a 5-4 vote. *Id.* at 926. The United States Supreme Court later denied certiorari. *Crawford v. Mississippi*, 136 S. Ct. 2527 (2016).

On state collateral review, petitioner argued that the trial court unlawfully "denied his request for funds to hire an expert" for his "insanity defense," his "appellate counsel neglected to raise" that "error on direct appeal," and his trial counsel "failed to investigate and present expert testimony" to support his "insanity defense." ROA.2434-2435. Petitioner sought vacatur of his rape conviction and contended that elimination of that "aggravator" entitled him to vacatur of his death sentence for Kristy's murder. ROA.2435-2436. The Mississippi Supreme Court determined that petitioner's expert-funding claim was procedurally barred because it "could have been raised in the direct appeal." ROA.3167. That court further held that his "ineffective assistance of counsel" claims failed under "*Strickland v. Washington*." ROA.3167.

15

Petitioner next sought habeas relief on thirteen grounds. ROA.5-70. The district court denied relief on all claims. ROA.953-988. The district court (as relevant here) rejected petitioner's expert-related claims. ROA.954-965. First, the court held that petitioner's expert-funding claim was unreviewable because it was not raised on direct appeal and later dismissed as procedurally barred on state post-conviction review. ROA.954-957. Second, the court determined that the expert-funding claim was never preserved as error at trial and appellate counsel's "failure to raise" that error was not "deficient conduct" and did not "prejudice the defense." ROA.963.; *see* ROA.957-963. That eliminated petitioner's reliance on appellate-counsel ineffectiveness to overcome the procedural-bar doctrine and as an independent claim. ROA.957-963. Third, the court rejected petitioner's trial-counsel-ineffectiveness claim based on counsel's failure to investigate and present an insanity defense keyed on petitioner's alleged "organic brain damage and/or epilepsy." ROA.963; *see* ROA.963-965. The court explained that reasonable judges could reject that argument because the record failed to show that "a reasonably competent attorney" would have investigated the matter further in May 1993 and failed to support petitioner's argument that counsel should have sought more "neuropsychological testing" before trial. ROA.964. The district court certified petitioner's claims for appeal. ROA.996-998.

16

A panel of this Court affirmed, rejecting petitioner's ineffectiveness claims under § 2254(d) and alternatively holding that petitioner failed to establish that law and justice required habeas relief. *See* Panel Opinion 5-20, No. 20-61019 (May 19, 2023) ("Op.").

To start, the panel noted that petitioner "raise[d] only three claims on appeal" and "abandoned" the other ten. Op. 5 & n.1. Then the panel held that petitioner's appellate- and trial-counsel ineffective-assistance claims failed under § 2254(d). Op. 5-13.

On appellate ineffective assistance, the panel rejected petitioner's arguments that counsel "provided ineffective assistance by failing to raise" an expert-funding claim "on direct appeal" and that counsel's alleged "ineffectiveness establishe[d] cause and prejudice" to overcome the procedural bar to habeas review on that claim's merits. Op. 5; *see* Op. at 8-9. Those overlapping claims each "turn[ed] on" counsel's alleged ineffectiveness for "failing to raise" the expert-funding claim "on direct appeal." Op. 8. That proposition failed under *Strickland*-§ 2254(d) review for two reasons. First, the panel "agree[d]" with the district court that reasonable jurists could view the expert-funding claim as "unpreserved" for appeal. Op. 9. Second, petitioner failed to prove that, under Supreme Court precedent, "every fairminded jurist would conclude that this is the extraordinary instance where an unpreserved claim was stronger than the preserved claims" raised on appeal. Op. 9.

17

Next, on trial-counsel ineffectiveness, the panel ruled that "fairminded jurist[s] could conclude that the trial counsel's performance was not deficient and prejudicial." Op. 10. For one thing, counsel's chosen defense strategy indisputably "contributed to" petitioner's success at trial in fending off "the kidnapping charge." Op. 10. For another, "before the rape trial," his "same trial counsel" had tried an expert-bolstered insanity defense "in the related assault trial" "and the jury rejected it." Op. 10. That illustrated, on *Strickland*-§ 2254(d) review, that "fairminded jurist[s] could conclude that counsel made an adequate strategic choice not to do the same thing over again and expect a different result." Op. 10.

Finally, in the alternative, the panel held that "[l]aw and justice d[id] not require habeas relief" where, as here, a habeas petitioner "is factually guilty" of his crimes. Op. 16; *see* Op. at 13-20. The panel stressed recent Supreme Court precedent holding that courts retain discretionary authority to "adjust the scope of the writ in accordance with equitable and prudential considerations," "[f]oremost" among them being the "powerful and legitimate interest in punishing the guilty." Op. at 16 (quoting *Brown v. Davenport*, 142 S. Ct. 1510, 1523 (2022)). The panel thus denied petitioner habeas relief because he "has not made a colorable claim of factual innocence." Op. 19.

This Court granted en banc review.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's judgment rejecting petitioner's habeas claims.

I. On doubly deferential habeas review dictated by *Strickland v. Washington* and 28 U.S.C. § 2254(d), petitioner has failed to establish that the state supreme court unreasonably applied *Strickland* in rejecting his ineffective-assistance claims. Petitioner's appellate counsel did not assert an alleged expert-funding denial on direct appeal. But the trial record proves that supposed error was unpreserved and lacked merit in any event. The unpreserved issue was not plainly stronger than the claims counsel raised on appeal, and certainly not so in the eyes of every reasonable jurist. Nor would every such jurist have to conclude that petitioner would have won on appeal if counsel had asserted that procedurally barred and meritless issue.

II. Petitioner's alternative trial-counsel-ineffectiveness arguments also fail under *Strickland*-§ 2254(d) review. Counsel strategically chose to pursue factual and temporary-insanity defenses at petitioner's rape/kidnapping trial. That approach succeeded in defeating the kidnapping charge and avoiding a life sentence for rape. And counsel's strategic choices were not plagued by unconstitutionally ineffective investigatory decisions. Before the trial, counsel had no reason to think that an expert-bolstered insanity approach, or some other temporary-

19

insanity theory, would play better to the jury. Counsel had already lost an expert-backed insanity defense in petitioner's prior assault trial arising from the same incident. And objective evidence had already ruled out brain damage-related theories. Any reasonable jurist could conclude trial counsel was constitutionally effective.

III. Independently, this Court can and should hold that law and justice do not require granting petitioner habeas relief. Petitioner has failed to make any colorable showing that he did not rape Kelly Roberts. It would thus be an appropriate exercise of this Court's equitable discretion to deny him habeas relief. That approach accords with federal courts' authority to adjust the scope of habeas relief to fit equitable and prudential considerations. And it comports with the text, structure, and purposes of AEDPA and the overall federal habeas statutory scheme, as well as important principles underlying habeas.

## STANDARD OF REVIEW

The district court denied petitioner's habeas claims. ROA.954-965. This Court reviews its findings of fact for clear error and its conclusions of law *de novo*. *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007).

# ARGUMENT

## I. Petitioner's Ineffective-Assistance Arguments Targeting His Appellate Counsel Fail Under The Doubly Deferential Review That *Strickland* And § 2254(d) Demand.

Under 28 U.S.C. § 2254(d) of AEDPA, federal habeas relief "shall not be granted" unless state-court adjudication of a petitioner's claim "resulted in" "an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court." Where a petitioner alleges ineffective assistance of counsel, the "clearly established Federal law" is the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Strickland* requires proof that counsel's "performance was deficient" and "prejudiced the defense." 466 U.S. at 687. The petitioner must establish "deficient performance" by proving "that counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Constitution. *Id.* at 687-88. On prejudice, "[i]t is not enough" to show that counsel's "errors impaired the presentation of the defense." *Strickland*, 466 U.S. at 693 (quotations omitted). The petitioner must establish "a reasonable probability that, *but for* counsel's unprofessional errors, the *result* of the proceeding would have been different." *Id.* at 694 (emphasis added). "The likelihood of a

21

different result must be *substantial*, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (emphasis added).

*Strickland* is deferential to counsel. Satisfying its "high bar is never an easy task," and it is near impossible when the strictures of § 2254(d)(1) apply. *Id.* at 105. A habeas petitioner "must show that the state court's ruling" under *Strickland* "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. That makes federal review of a state court's application of *Strickland* doubly deferential. *Id.* at 105 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (quotations omitted). The petitioner must do more than "convince" this Court that "the state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 699 (2002). He must prove that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Ibid.* "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.

Where, as here, a state court's *Strickland* "decision is unaccompanied by an explanation," a federal "habeas court must determine what arguments or theories … could have supported" that decision and then "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with"

22

*Strickland. Id.* at 98, 102. That is "the only question that matters under § 2254(d)(1)." *Ibid.*

### A. The Mississippi Supreme Court's rejection of petitioner's theory that appellate counsel should have raised an unpreserved and meritless expert-funding claim on direct appeal was objectively reasonable.

On state-level review, petitioner argued that "his request for funds to hire an expert" for an "insanity defense" was unlawfully denied and that his "appellate counsel neglected to raise" that "error on direct appeal." ROA.2434. The Mississippi Supreme Court ruled that the expert-funding claim was not "raised in the direct appeal" and thus defaulted. ROA.3167. That first ruling barred further review of the merits of his expert-funding claim because a habeas court "may not review federal claims that were procedurally defaulted in state court." *Davila v. Davis*, 582 U.S. 521, 527 (2017). The supreme court further ruled that petitioner's "ineffective assistance of counsel" claims failed under *Strickland*. ROA.3167. That second ruling triggered § 2254(d). *Richter*, 562 U.S. at 102; *see also Jackson v. Epps*, 447 F. App'x 535, 541-42 (5th Cir. 2011) (§ 2254(d) applies to *Strickland* appellate-ineffectiveness claims adjudicated "on the merits" in state court and offered as "cause" to "overcome a procedural default").

On habeas review, the district court and a panel of this Court determined that reasonable judges could reject petitioner's appellate-

ineffectiveness theory—*i.e.*, what he now offers as the sole ground for overcoming the procedural default of his expert-funding claim. Pet. Br. 19-27. The panel and the district court held that petitioner's theory failed because the expert-funding claim was "unpreserved" and counsel's failure to assert that forfeited claim did not violate *Strickland*. Op. 9; *see* ROA.954-963. The en banc Court should reach the same conclusion.

*First*, reasonable jurists could conclude that petitioner's expert-funding claim was unpreserved.

In 1992, petitioner's trial counsel moved for expert funding and attached a psychologist's (Dr. L.D. Hutt) affidavit, which suggested petitioner "may be suffering from some illness" but did not say "in black and white" that those problems affected his "ability to perceive the wrongfulness of his act." ROA.2068.; *see* ROA.1043-1044. But the defense strategy shifted over time and the motion was withdrawn and/or abandoned before trial.

The trial court never denied the expert-funding motion. At later hearings, the motion remained unresolved as the court and the parties developed a plan to complete a competence assessment of petitioner. *See* ROA.2096-2097, 2101-2114.

At a pre-trial hearing in March 1993, the court called the "motion to provide funds for expert assistance." ROA.1392. Petitioner's counsel responded that that was "a moot question" in the aggravated-assault case

24

(number 5779). ROA.1392. But counsel proceeded to make other strategic moves for both cases. He confirmed that petitioner would exclusively assert an "insanity defense" to the aggravated-assault charge, ROA.1393., that petitioner's motion to consolidate the aggravated-assault and murder/rape case was withdrawn, ROA.1400., and that petitioner resisted consolidation, ROA.1404-1406. He was "becoming more and more convinced that [he] may try [the rape/kidnapping] case on its merits and not interpose or withdraw the insanity defense." ROA.1405-1406. The trial court then asked: "if I'm hearing you correctly, you're going to withdraw all your motions that are inconsistent with the position you're now taking[?]" ROA.1408. Petitioner's counsel confirmed: "Yes, sir." ROA. 1408.

Thus, by March 1993, petitioner's counsel had withdrawn the expert-funding motion and changed defense tactics. And even assuming the request was not withdrawn, counsel never raised it again. So he at least strategically abandoned it before trial.

Counsel's moves fit with his overall defense strategies. In May, at the aggravated-assault trial, counsel used an insanity defense based largely on Hutt's testimony and lost. *Crawford*, 787 So. 2d at 1243. As counsel had forecasted at the prior hearing, counsel pivoted to factual and insanity defenses bolstered by lay testimony and cross-examination of the prosecution's experts at the August rape/kidnapping trial.

25

ROA.1489-1494. He won two victories: the jury rejected the kidnapping charge and a life sentence for rape. ROA.1250. Any reasonable jurist could review the record and conclude that the expert-funding motion was strategically withdrawn, abandoned, or withdrawn *and* abandoned—and in any event was unpreserved for appeal.

*Second*, reasonable jurists could conclude that appellate counsel's failure to assert the unpreserved expert-funding claim on direct appeal comported with *Strickland*.

*Strickland*'s deficiency-prejudice standard governs appellate-ineffectiveness claims. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). On deficient performance, when counsel omits a "particular nonfrivolous issue" on appeal, a habeas petitioner must show that it "was clearly stronger than issues that counsel did present." *Id.* at 288. Unpreserved-issue claims rarely succeed. "[I]n most instances," when "the trial court did not rule on the alleged trial error (because it was not preserved)," that unpreserved error "will not be a plainly stronger ground for appeal than preserved errors." *Davila*, 582 U.S. at 533. Moreover, on habeas review, § 2254(d) demands more. The petitioner must establish that every reasonable jurist would conclude that the unpreserved and unasserted issue was plainly stronger than the issues raised on appeal. *Richter*, 562 U.S. at 102. Petitioner cannot meet these requirements.

Appellate counsel did not assert an expert-funding claim on direct appeal. But that was not *Strickland* deficient. Counsel raised several strong arguments on appeal and the Mississippi Supreme Court narrowly affirmed petitioner's rape conviction on a 5-4 vote. *Crawford*, 192 So. 3d at 926. That was constitutionally competent performance. The unpreserved and unasserted expert-funding issue was not "plainly stronger" than those that fractured the justices.

And assuming petitioner could overcome § 2254(d) on deficiency he still cannot prove prejudice. No "reasonable probability" exists that "but for" counsel's failure to raise the unpreserved expert-funding issue the appeal's outcome "would have been different." *Strickland*, 466 U.S. at 694. Reasonable jurists could conclude that the issue would have failed as procedurally barred. *See*, *e.g.*, *Ady-Cazorla v. State*, 309 So. 3d 1169, 1173 (Miss. Ct. App. 2021) ("[W]hen a trial court has not ruled on a motion, a defendant is procedurally barred on appeal from claiming error.") (quotations omitted). Mississippi appellate courts would have enforced those longstanding rules here. And petitioner has never identified a state expert-funding decision that excused a default and the defendant prevailed on the merits. *See*, *e.g.*, *Ross v. State*, 954 So. 2d 968, 1007 (Miss. 2007) (expert claim "procedurally barred" and "without merit"); *Pinkney v. State*, 538 So. 2d 329, 343 (Miss. 1988) (barred expert claim also had "no merit").

27

The district court's denial of petitioner's appellate ineffective-assistance claim should be affirmed.

## B.    Petitioner's counterarguments lack merit.

Petitioner rests his appellate-ineffectiveness claim on counsel's failure to press an expert-funding claim on direct appeal. *See* Pet. Br. 19-27. His arguments ignore the state-court record, settled legal principles, and the every-reasonable-jurist standard.

1. Petitioner's lead argument is that his trial counsel "preserved" an expert-funding claim that was "meritorious." Pet. Br. 21; *see id.* at 20-23. He is wrong on both fronts.

*First*, on the unpreserved feature of his claim, petitioner contends that his expert-funding motion "was never withdrawn" and "was fully preserved." Pet. Br. 21. That contention fails on double-deference review and is incorrect under any standard.

Counsel withdrew the expert-funding motion. Petitioner contends (Pet. Br. 24) that, during the March 1993 hearing, counsel limited his withdrawal of the "motion to provide funds for expert assistance" to the aggravated-assault case. ROA.1392. But that is only part of the story. Later in that hearing, counsel revealed his strategy to defend the rape/kidnapping case "on its merits" and possibly without an "insanity defense." ROA.1405-1406. When the trial court asked if "you're going to

28

withdraw all your motions that are inconsistent with the position you're now taking[?]," the answer was: "Yes, sir." ROA.1408. That withdrawal left any alleged expert-funding error unpreserved.

Even assuming the motion was not withdrawn at the March hearing, it was at least abandoned. The trial court never denied the motion. And after that hearing, the issue was never raised again. That is classic abandonment. Either way—withdrawn and/or abandoned—any reasonable jurist could reject petitioner's view that expert funding was "fully preserved" for appeal. Pet. Br. 21.

Petitioner alternatively contends that the expert-funding motion was "repeatedly rejected" so the district court was wrong to find that the trial court "never denied counsel's request for funds." Pet. Br. 24 n.2. As shown, that is wrong. *Supra* 8-12, 24-25. The trial court made it clear that petitioner had the "right to come back" and seek expert funding. ROA.2097.; *see also* ROA.2069.

*Second*, on the merits, petitioner insists that the pretrial record reveals an "obvious constitutional error." Pet. Br. 20; *see id.* at 19-23. That is so, he believes, because trial counsel made a "threshold showing" under *Ake v. Oklahoma*, 470 U.S. 68 (1985), yet the trial court "insisted that the State's experts" must find petitioner "insane before the court would provide him with expert assistance." Pet. Br. 20. Those contentions are unavailing.

29

Reasonable jurists could conclude that the trial court never erred. In *Ake*, the Supreme Court ruled that when an indigent "defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial," the trial court must permit the defendant "access to a competent psychiatrist" to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. The Court added that "[t]his is not to say" that "the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Ibid.* The defendant in *Ake* plainly met the "significant factor" test: insanity was his only defense; his behavior in court was "so bizarre" that the trial court *sua sponte* ordered a competency examination, which deemed him "incompetent to stand trial"; he only became "competent" because of heavy medication; and psychiatrists concluded that he had "sever[e]" "mental illness" that may have begun "many years" prior to his offense. *Id.* at 86.

Petitioner, by contrast, failed to clear the "significant factor" standard before counsel withdrew and/or abandoned the expert-funding issue during the pretrial proceedings. Only the "evidence" that was "before the trial judge" during those hearings is relevant to this analysis. *Williams v. Collins*, 989 F.2d 841, 844 n.10 (5th Cir. 1993). And "bare assertion[s]" of insanity and "evidence of mental problems generally" are

30

insufficient. *Id.* at 845. Rather, the defendant must establish that his "sanity [was] seriously in issue" with proof of "reasonable ground[s] to doubt [his] sanity at the time of the offense." *Ibid* (quotations omitted); *see also id.* at 846 ("due process does not require the government automatically to provide indigent defendants with expert assistance upon demand"); *Parker v. State*, 273 So. 3d 695, 700 (Miss. 2019) (the "defendant must come forth with concrete reasons, not unsubstantiated assertions that assistance would be beneficial").

Here, during the relevant pretrial period, petitioner's "significant factor" showing rested on Hutt's 1992 expert affidavit and subsequent court-ordered examinations. The affidavit suggested petitioner "may be suffering from some illness" but did not say "in black and white" that those problems affected his "ability to perceive the wrongfulness of his act." ROA.2068. And the court-ordered examinations indicated that petitioner was competent to stand trial, that his claimed memory deficits were not credible, and that he could distinguish right from wrong at the time of his crimes. ROA.1135-1136. Thus, no compelling proof was ever before the trial court showing a "reasonable ground to doubt" petitioner's "sanity" when he raped his victim. The trial court never denied petitioner's expert-funding motion. But, assuming a denial, the trial court did not err.

31

Relatedly, petitioner asserts that the trial court would not grant the expert-funding motion until state "experts" deemed petitioner "likely insane" and "made proof of insanity a precondition to expert assistance." Pet. Br. 22; *see id.* at 20. That misconstrues the trial-court record. The trial court never ruled that the court-ordered examination had to find petitioner "insane" or "likely insane." The court said it needed a "preliminary report" to "see where we are" and that course was "without prejudice" to "either side" seeking an "examination" or expert "funds." ROA.2069.; *see also* ROA.2097. It is true (Pet. Br. 22) that during a hearing the trial court said, "I'm not going to spend $3,000 of Tippah County's money." ROA.2069. But that cherry-picked quote does not prove the trial court denied the motion on funding concerns (or otherwise). The judge said that in the context of making clear that the court first wanted the petitioner examined by a court-appointed examiner, who would "make a report to the court," and "[w]e will take it from there." ROA.2068-2069. He then explained: "I'm going to get a preliminary report and see where we are" and then assess any "further motions from either side for examination or for funds." ROA.2069.

Next, petitioner contends the trial court's approach was not harmless error. Pet. Br. 23-27. The trial court never erred, and as shown, the issue was never preserved. *Supra* 8-12, 24-25. Even if this were not the case, the trial court's approach did not have a "substantial and

32

injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Had the trial court granted the motion for funds to hire Hutt, he would have testified—consistent with his assault-trial testimony—that petitioner suffered from "bipolar disorder" and could not "differentiate between right and wrong" during the rape. *Crawford*, 787 So. 2d at 1240. But the jury in the assault case rejected that theory. *Id.* at 1241. There is no reason to believe Hutt's testimony would have produced a different result at the rape/kidnapping trial. Any supposed error in the trial court's approach to the expert-funding issue was thus at most harmless.

2. Petitioner next maintains that his appellate counsel's performance was "deficient and prejudicial." Pet. Br. 23; *see id.* at 20, 23-27. Those arguments fail for reasons already explained. *Supra* 23-27.

On deficiency, petitioner relies on appellate counsel's hindsight view that omitting the expert-funding claim was "oversight" and not a "conscious decision." Pet. Br. 24. But reasonable jurists do not have to credit that assertion. *Strickland* requires proof that "counsel was objectively unreasonable." *Robbins*, 528 U.S. at 285. Counsel's omission was objectively the right call, even if allegedly unintended. The expert-funding claim was unpreserved and, even if it were preserved, it was not "clearly stronger" than the issues counsel did present on appeal. *Supra* 24-27.

Additionally, appellate counsel's retrospective affidavit (*see* Pet. Br. 13, 16) is irrelevant. *Strickland* requires a reconstruction of "the circumstances of counsel's challenged conduct" and focuses on the objective reasonableness of counsel's performance. 466 U.S. at 689. Measured at the time of the appeal, it was objectively reasonable for counsel not to press on appeal a claim that was withdrawn or at least abandoned by trial counsel and weak in any event.

On prejudice, petitioner argues that the trial court "denied" him "the ability to build a defense and rebut" the prosecution's experts. Pet. Br. 27; *see id.* at 23. That is incorrect. As shown, the trial court never denied a request for expert funding. Trial counsel withdrew (or abandoned) the funding request as part of his strategic choice to present factual and insanity defenses based on lay testimony. That choice was informed by counsel's failure on an expert-bolstered approach at the assault trial. There is thus no basis to conclude "a reasonable probability" exists that "the result" of petitioner's direct appeal "would have been different" had petitioner's appellate counsel raised the expert-funding claim given these facts. *Strickland*, 466 U.S. at 694.

## II.    Petitioner's    Alternative    Trial-Counsel-Ineffectiveness Arguments Also Fail Under Doubly Deferential Review.

The same doubly deferential standard that governs petitioner's appellate-ineffectiveness claim applies to his alternative attack on trial counsel's effectiveness. He must overcome *Strickland*'s requirements, and that showing must surmount § 2254(d) review. *Supra* 21-23.

### A.    The    Mississippi    Supreme    Court's    rejection    of petitioner's    ineffective-assistance-of-trial-counsel claims was objectively reasonable.

On state review, petitioner faulted trial counsel's strategy to defend the rape and kidnapping charges on "innocence" and "insanity" grounds. ROA.2464. Petitioner further alleged that "counsel failed to conduct a basic investigation" of his "medical and social history" and "ignor[ed]" signs of an alleged "need" for "epilepsy and brain damage" evaluations. ROA.2465. The Mississippi Supreme Court rejected those claims under "*Strickland v. Washington*." ROA.3167. The district court and the panel ruled that reasonable jurists could conclude counsel executed an "adequate strategic choice" that comported with *Strickland*. Op. 10; *see* Op. 10-13; ROA.963-969. The en banc Court should reach the same conclusion.

*First*, reasonable jurists could conclude that trial counsel's defense strategy on the rape/kidnapping case was constitutionally effective.

*Strickland* demands that "scrutiny" of trial counsel's "performance must be highly deferential." 466 U.S. at 689. The "fair assessment" must "eliminate the distorting effects of hindsight" and must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate" it "from counsel's perspective at the time." *Ibid.* That includes applying "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because "[t]here are countless ways to provide effective assistance in any given case." *Ibid.* And well-informed "strategic choices" are "virtually unchallengeable." *Id.* at 690.

Trial counsel's strategy to try the rape/kidnapping case on factual and insanity defenses without an expert fell within *Strickland*'s "wide range of reasonable professional assistance." *Id.* at 689; *see Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) ("strategic decisions—including whether to hire an expert—are entitled to a strong presumption of reasonableness") (quotations omitted). That approach was partially successful: the jury found petitioner not guilty of kidnapping and rejected a life sentence for the rape. ROA.1250. Moreover, counsel had already tested an expert-bolstered insanity-only strategy at the assault trial (involving the same incident). *Crawford*, 787 So. 2d at 1240-41. He cross-examined the victims on the facts and the prosecution's experts on insanity. *Id.* at 1240. And Hutt had testified for the defense that petitioner suffered from "bipolar disorder," could not "differentiate

36

between right and wrong" at that time, and (among other things) relied on his "examination" of petitioner, "extensive mental health records," and "a battery of psychological tests." *Id.* at 1240, 1243. That approach did not work. Any reasonable jurist could conclude that counsel made an adequate strategic choice not to repeat that approach at the rape/kidnapping trial.

Any reasonable jurist could likewise conclude that petitioner suffered no prejudice from trial counsel's approach. *Strickland* requires proof that *but for* counsel's strategic choice the jury's verdict "would reasonably likely have been different." 466 U.S. at 696. And to overcome *Strickland*-§ 2254(d)'s "doubly deferential standard of review," petitioner must convince this Court "that every reasonable jurist would conclude that it is reasonabl[y] likely" that petitioner would have been acquitted but for counsel's strategy. *Flores v. Lumpkin*, 72 F.4th 678, 683-84 (5th Cir. 2023) (quotations omitted). He cannot. Counsel's partially successful defense strategy at trial was bookended by losses on insanity-only expert-bolstered defenses. *See Crawford*, 787 So. 2d at 1240-41 (assault); *Crawford*, 716 So. 2d at 1035-37 (capital murder/rape). Reasonable judges could thus reason that an insanity-expert approach would not have succeeded where it failed *before* and *after* petitioner's rape conviction.

*Second*, reasonable jurists could conclude that counsel's investigatory decisions that informed his defense strategy comported with *Strickland*.

Counsel should undertake "reasonable investigations" or "make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. But assessing those decisions cannot rely on "the harsh light of hindsight." *Bell*, 535 U.S. at 702. Rather, courts must make "every effort" to "reconstruct the circumstances," "evaluate" counsel's decisions from his "perspective at the time," and ignore "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Petitioner's insufficient-investigation argument fails under these principles and the every-reasonable-jurist standard. The argument (according to petitioner's habeas petition) relies on a daisy-chain of inferences invented years after trial. The chain starts with an affidavit crafted over two decades after the rape conviction. ROA.29-35.; *see* ROA.2492-2494. (Nadkarni affidavit). That affidavit contends that petitioner's "story is one of primarily brain injury and untreated epilepsy." ROA.2492. Then, building off that story, petitioner relies on Hutt's May 1993 affidavit, post-rape-trial testimony of friendly witnesses, jail and medical records, and affidavits of his trial counsel and Mark Webb. ROA.25-35. He says that material establishes that even a "cursory investigation" would have revealed "substantial evidence" of

38

"brain damage and epilepsy" that compelled counsel to take a different approach to the August 1993 rape/kidnapping trial. ROA.29.; *see* ROA.29-35.

That argument fails to accurately "reconstruct the circumstances" that trial counsel faced in 1993 and objectively account for counsel's "perspective at th[at] time." *Strickland*, 466 U.S. at 689. The May 1993 Hutt affidavit says that petitioner suffered "seizures" which "could possibly be caused by organic brain damage." ROA.3009. Hutt said that "[t]o discern the presence of organic brain damage, neurological testing in the form of an E.E.G. should be performed" and that he "was told that such a test has been performed" but had "not seen the results." ROA.3009. None of that shows trial counsel unreasonably failed to investigate alleged "organic brain damage" supposedly resulting from seizures any further before the August 1993 rape trial. The May 1993 E.E.G. that Hutt had not "seen" was normal. ROA.3039. And courts have *rejected* that exact argument at least twice on post-conviction review of petitioner's capital conviction—before and after Nadkarni's opinion on "organic brain damage" two decades after petitioner's trials. *Crawford*, 2008 WL 4419347, at *50 (E.E.G. identified in Hutt's May 17, 1993 affidavit "was performed … on May 4, 1993, and those results were normal" and "there is no indication that Petitioner suffers from organic brain damage"); *Crawford*, 218 So. 3d at 1158 (rejecting petitioner's

39

"organic brain damage" theory because he "had received two CT scans and two EEGs in 1993" and "[a]ll results were normal except for one EEG, which showed more testing was indicated"); *see also* ROA.3048. (May 2, 1993 CT scan "normal"); ROA.3061. (July 12, 1993 CT scan "normal"); ROA.3060. (August 11, 1993 (post-rape trial) E.E.G. "probably normal"). Trial counsel had no reason to suspect petitioner suffered from "organic brain damage" caused by seizures in May 1993 (or any other time prior to the rape trial). The objective evidence available at that time, in fact, bolstered his trial strategy.

Petitioner's other "evidence" also does not help him. The family-and-friend testimony and institutional records, as the district court found, do not support the view that—*after* the Hutt affidavit and negative tests in May 1993—"a reasonably competent attorney" had to "launch[ ] a new investigation into the insanity defense" before the rape/kidnapping trial. ROA.964. Webb's 2014 affidavit is likewise irrelevant. ROA.3161-3162. Webb claimed that petitioner's "attorneys" were advised to test for "organic brain damage," and mentioned testing from "August 11, 1993." ROA.3161. But Webb's affidavit does not say when he recommended any brain-damage testing and focuses on petitioner's "capital murder case." ROA.3161. And August 11, 1993, was *after* petitioner's conviction for raping Kelly Roberts. Webb's 2014 affidavit does not prove that counsel

40

should have further investigated an alleged link to an insanity defense founded on "organic brain damage" before the rape/kidnapping trial.

The district court's denial of petitioner's trial-counsel-ineffectiveness claim should be affirmed.

## B.    Petitioner's attacks on trial counsel's strategic choices and investigatory decisions lack merit.

Petitioner faults trial counsel's strategy not to pursue and preserve his "self-evidently meritorious" expert-funding claim and "concomitant" decision not to use "expert testimony" on his "insanity defense." Pet. Br. 28; *see id.* at 27-35. His arguments fail under doubly deferential review.

1. On deficient performance, petitioner first contends that the panel wrongly emphasized counsel's overall effectiveness and that "adequate performance on other issues" is irrelevant to counsel's insanity-defense-related decisions. Pet. Br. 28. But the panel's approach aligns with *Strickland*. The standard requires a wholistic analysis and requires proof of a "breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687; *see id.* at 687, 690 (errors must be "so serious as to deprive the defendant of a fair trial" and review must consider "the facts of the particular case" and "all the circumstances"). And although an isolated "egregious and prejudicial" error could support a claim, "it is difficult to establish ineffective assistance when counsel's overall

41

performance indicates active and capable advocacy." *Richter*, 562 U.S. at 111.

Relatedly, petitioner faults counsel for not preserving an allegedly "meritorious" expert-funding claim and insists that "deficient performance" on that "defense can affect 'the judgment' regardless of counsel's performance" on "other defenses." Pet. Br. 29. But foregoing expert funds was not an independent "defense." It was part of counsel's overall trial strategy, which was effective under any reasonable application of *Strickland*.

Next, petitioner attacks the panel's ruling that counsel's strategy that relied on factual and "insanity" defenses with "lay testimony" was an "adequate strategic choice." Pet. Br. 29. That determination, petitioner says, is "irreconcilable" with "Supreme Court precedent" on reasonable investigations. Pet. Br. 29. He is wrong.

*Strickland* imposes no *per se* rule that requires "an equal and opposite" defense expert "for every prosecution expert." *Richter*, 562 U.S. at 111. Nor does *Strickland* require more than a "reasonable" investigation or "a reasonable decision" that renders further "investigations unnecessary." 466 U.S. at 691.

Trial counsel had no reason to think—*before* the rape/kidnapping trial in August 1993—that an expert-assisted investigation into seizures or brain damage might explain petitioner's criminal conduct. *Supra* 11-

42

12, 38-41. That defeats petitioner's argument that counsel had "no reasonable basis" to forgo an expert-based "insanity defense" at trial. Pet. Br. 30. Take petitioner's collateral evidence (friends-and-family testimony, institutional records, and victim testimony on petitioner's attacks). Pet. Br. 30. None of that gave counsel *pre-trial* notice to hunt for an insanity link to seizures or brain damage. Pretrial medical records, for example, showed diagnoses of "bipolar disorder" and "substance abuse." *Crawford*, 787 So. 2d at 1242. And, as petitioner contends (Pet. Br. 30), a July 1992 evaluation mentioned a "possibility" that petitioner "has some type of seizure activity" that a "neurologist" could investigate. ROA.2899. But that was only "a very, very remote possibility" and predated petitioner's negative test results in 1993. ROA.2899.

Next, petitioner emphasizes the "more to the point" Hutt and Webb affidavits. Pet. Br. 30. But they never "told" counsel that petitioner's "seizures and blackouts could be evidence of brain damage" any time before trial. Pet. Br. 30. As shown, Hutt's May 1993 affidavit bolstered counsel's investigatory decisions and strategic choices. *Supra*, 11-12, 38-40. Hutt suspected "organic brain damage" and recommended an "E.E.G." ROA.3009. But an E.E.G. a few days earlier disproved that suspicion. ROA.3039.; *see supra* 38-40. Webb's 2014 affidavit also fails to prove counsel had reason to investigate brain-damage theories *before* the rape/kidnapping trial. *Supra*, 40-41.

43

Petitioner next contends, based on a 2015 affidavit, that counsel "believed" that the trial court would have ordered him to use the "'same experts that would testify for the State'" had he pursued expert funding. Pet. Br. 31 (quoting ROA.3165.). But courts must "reconstruct the circumstances" and rely on "counsel's perspective at the time" of trial. *Strickland*, 466 U.S. at 689; *see* ROA.969. (district-court ruling condemning counsel's 2015 affidavit as a "belated review of long-ago events"). Nothing in the record backs counsel's retrospective "belief." The trial court ordered pretrial competency and sanity evaluations but repeatedly left open the expert-funding request. *Supra* 8-12. Counsel's affidavit ignores those events and fails to cite anything the trial court said to bolster counsel's retrospective "same experts" speculation.

Next, petitioner contends that *Ake* and other precedents establish that counsel unreasonably failed "to investigate [petitioner's] seizures and brain damage." Pet. Br. 31. Each contention fails.

To start, under *Strickland*, counsel must "investigate a client's medical history when *it becomes clear* that the client is suffering from mental difficulties rendering him insane or incompetent to stand trial." *Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005) (emphasis added). But it never "became clear" to counsel—before the rape/kidnapping trial— that "seizures" or "brain damage" might explain petitioner's violent crimes. The pretrial evidence (Hutt's May 1993 affidavit and diagnostic

tests) refuted that theory. *Supra* 11-12, 38-40. Counsel had also already lost the assault case. His "perspective at the time," *Strickland*, 466 U.S. at 689, showed no reason to investigate a theoretical link between petitioner's crimes and alleged seizures or brain damage invented decades later. *See Crawford*, 218 So. 3d at 1156-60.

Next, the same facts defeat petitioner's reliance on this Court's insanity-investigation precedents. *See* Pet. Br. 32 (citing *Lockett v. Anderson*, 230 F.3d 695, 713-15 (5th Cir. 2000); *Bouchillion v. Collins*, 907 F.2d 589, 596-97 (5th Cir. 1990); *Profitt v. Waldron*, 831 F.2d 1245 (5th Cir. 1987); *Beavers v. Balkom*, 636 F.2d 114 (5th Cir. 1981)). Unlike here, those cases involved little or no investigation where insanity was the only possible defense. And even if those precedents were comparable to petitioner's case, they are not the measuring stick for § 2254(d) review.

Petitioner also emphasizes that *Ake* and state cases generally recognize the "importance of expert testimony in insanity cases." Pet. Br. 32. That, again, ignores counsel's knowledge *before* the rape/kidnapping trial and that his strategy call was not "insanity only." A reasonable all-the-circumstances *Strickland* review could conclude that cross-examining opposing experts *plus* shielding a defense expert from cross and *not confessing* that petitioner raped and kidnapped Kelly Roberts (as an insanity-only defense requires) was constitutionally effective. *See Richter*, 562 U.S. at 111 ("In many instances cross-examination will be

45

sufficient to expose defects in an expert's presentation" and without a "solid case," "the best strategy" may be to attack the prosecution's "theory."). And particularly so where counsel already tried and lost the assault trial.

Finally, petitioner contends that counsel's "assault trial" experience cannot justify "counsel's failure to investigate [petitioner's] mental health." Pet. Br. 32. That is so, petitioner contends, because the "expert testimony" there was "limited" by lack of testing (Pet. Br. 32) and counsel's 2015 affidavit speculates that he would have had "to use the State's experts" if he sought expert funds (Pet. Br. 33). Those propositions are incorrect. Hutt's assault-trial testimony was not hamstrung by lack of testing. *See Crawford*, 787 So. 2d at 1243 (battery of tests performed). The E.E.G. testing that Hutt flagged in May 1993 ruled out the brain-damage theory. ROA.3039.; *see supra* 38-40. And reasonable jurists could view counsel's retrospective affidavit as inaccurate, speculative, and unreliable. *Supra* 44.

2. On prejudice, petitioner argues that a different approach would have produced a better result for three reasons. Pet. Br. 33-35. None proves that every reasonable jurist must conclude that petitioner established a "substantial, not just conceivable" likelihood of a different result *but for* trial counsel's alleged mistakes. *Richter*, 562 U.S. at 112.

46

First, petitioner contends that he would have won on appeal if the expert-funding claim had "been preserved and presented." Pet. Br. 33. But that assumption answers the wrong question (would the jury verdict have been different) and ignores other flaws. The claim was meritless even if preserved (which it was not). *Supra* 29-31. A different approach by counsel would not have overcome the evidence that undermined the theory that seizures or brain damage explained his crimes. *Supra* 38-41. And the expert-funding claim is defaulted for purposes of habeas review. *See Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022). Petitioner cannot overcome that default without winning his appellate-ineffectiveness claim, which fails. *See supra* Part I.

Second, petitioner contends that an expert presentation of his seizures/brain-damage theory "would have materially changed the evidentiary picture" at the trial. Pet. Br. 34; *see* Pet. Br. 33-34 (quoting ROA.2492-2494. (Nadkarni affidavit)). But reasonable jurists could apply *Strickland* to reject that view. In August 2016, the Mississippi Supreme Court discredited materially identical prejudice arguments founded on Nadkarni's theory in petitioner's *Strickland* challenge to his capital-murder conviction. *See Crawford*, 218 So. 3d at 1157-60.

Third, petitioner argues prejudice here "is particularly clear" under this Court's burden-shifting rationale in *Profitt v. Waldron*. Pet. Br. 34-35. But that rationale does not help petitioner. In *Profitt*, trial counsel

47

failed to introduce proof that would have shifted the burden to the prosecution to prove the defendant's sanity. 831 F.2d at 1250. Here, petitioner's evidentiary showing shifted the burden. *See Crawford*, 192 So. 3d at 920-22. A different approach by counsel was unnecessary to achieve that goal.

## III. Independently, This Court Should Reject Petitioner's Claims Because Law And Justice Do Not Require Granting Him Habeas Relief.

As explained above, petitioner's claims fail on *Strickland*-§ 2254(d) review. That dooms his petition. The Court can and should independently hold that petitioner also has not made a colorable showing of factual innocence such that "'law and justice require'" habeas relief. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (quoting 28 U.S.C. § 2243).

### A. This Court can require petitioner to satisfy a factual innocence requirement.

The Supreme Court recently confirmed that federal courts have considerable discretion "to adjust the scope" of habeas to fit "equitable and prudential considerations." *Davenport*, 142 S. Ct. at 1523. "States' powerful and legitimate interest in punishing the guilty," the Court stressed, is "[f]oremost" among those considerations. *Ibid.* (quotations omitted). Requiring petitioner to make a colorable showing of factual innocence aligns with those principles. It also accords with AEDPA and

Congress's broad statutory command to resolve habeas petitions only "as law and justice require."

1. Federal courts possess equitable authority to condition habeas relief on a showing of factual innocence. Statutes govern habeas relief, but the writ remains "at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995). Federal habeas statutes "leave[ ] unresolved many important questions about the scope of available relief." *Danforth v. Minnesota*, 552 U.S. 264, 278 (2008). The statutes have always "used permissive rather than mandatory language" in describing the "power to grant" habeas. *Davenport*, 142 S. Ct. at 1520 (quotations omitted). And Congress has "command[ed]" courts to "dispose of habeas petitions 'as law and justice require.'" *Danforth*, 552 U.S. at 278 (quoting 28 U.S.C. § 2243); *see Munaf v. Geren*, 553 U.S. 674, 693 (2008) ("[E]ven where a habeas court has the power to issue the writ," the question remains whether that power "ought to be exercised."). These principles confirm that courts enjoy broad authority "to adjust the scope of the writ in accordance with equitable and prudential considerations." *Davenport*, 142 S. Ct. at 1523.

Petitioner contends that the habeas statutes confine courts' "discretion" to devising "certain interstitial claims-channeling rules." Pet. Br. 47. Not so. Federal courts have long exercised their equitable authority to adjust the *substantive scope* of the writ. *E.g.*, *Holland v.*

49

*Florida*, 560 U.S. 631, 646 (2010) ("[E]quitable principles have traditionally governed the substantive law of habeas.") (quotations omitted). Federal courts have often "expanded" and "narrow[ed]" "the grounds on which habeas corpus relief [is] available." *Kuhlmann v. Wilson*, 477 U.S. 436, 446, 447 (1986) (plurality). And they have done so "even where the statutory language authorizing" habeas review "remained unchanged." *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *see Brecht*, 507 U.S. at 633 ("[I]n defining the scope of the writ," the Supreme Court has "look[ed] … to the considerations underlying [its] habeas jurisprudence" to "determine whether [a] proposed rule would advance or inhibit these considerations by weighing the marginal costs and benefits.").

For example, while habeas courts traditionally would grant relief only "if the court of conviction lacked jurisdiction over the defendant or his offense," the Supreme Court in *Brown v. Allen*, 344 U.S. 443 (1953), expanded habeas to review of state court rulings on federal constitutional claims. *Davenport*, 142 S. Ct. at 1521, 1522. After *Brown* expanded the writ, later cases reined in its scope. In *Stone v. Powell*, 428 U.S. 465 (1976), for example, the Court excluded Fourth Amendment claims from habeas review based on "prudential concerns counseling against" applying the "exclusionary rule on collateral review." *Withrow v. Williams*, 507 U.S. 680, 686 (1993). The Court has limited the scope of

habeas review in several other ways to return "the Great Writ closer to its historic office." *Davenport*, 142 S. Ct. at 1523; *e.g.*, *Brecht*, 507 U.S. 619 (harmless-error); *McCleskey v. Zant*, 499 U.S. 467 (1991) (abuse-of-the-writ); *Teague v. Lane*, 489 U.S. 288 (1989) (retroactivity); *Wainwright*, 433 U.S. 72 (procedural default).

In exercising that equitable authority, the Supreme Court has highlighted the writ's disruptive impacts on state sovereign power and society's interest in criminal justice. "The power to convict and punish criminals lies at the heart of the States' 'residuary and inviolable sovereignty.'" *Ramirez*, 142 S. Ct. at 1730 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)). Federal habeas review "frustrat[es] both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). It "disturbs" States' "significant interest in repose for concluded litigation," "denies society the right to punish some admitted offenders," and "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Richter*, 562 U.S. at 103. For these reasons, the Supreme Court has stressed that habeas relief must be "reserved for only extreme malfunctions in the state criminal justice system." *Davenport*, 142 S. Ct. at 1524 (quotations omitted).

Petitioner pushes back on those points by observing that federal courts have "granted habeas relief without considering innocence" in "numerous cases." Pet. Br. 42. But these cases (which predate the Supreme Court's most recent efforts to return the writ to its "historic office") at most show that equitable and prudential considerations militate against factual-innocence considerations in certain cases. In other cases (like this one), "[o]ne can legitimately question whether" granting relief to "a petitioner who is guilty beyond a reasonable doubt of a heinous crime" advances the "central concern" of habeas—"redressing an unjust incarceration." *Barksdale v. Blackburn*, 639 F.2d 1115, 1120 (5th Cir. 1981) (en banc). Here, the "profound societal costs" of habeas tip the scales toward the "powerful and legitimate interest in punishing the guilty … shared by the State and the victims of crime alike." *Calderon v. Thompson*, 523 U.S. 538, 554, 556 (1998).

2. A factual innocence requirement comports with AEDPA's text, structure, and purposes. "AEDPA imposes several limits on habeas relief," and federal courts "have prescribed several more." *Ramirez*, 142 S. Ct. at 1731. Together, these limits promote respect for state-court judgments and "ensure that federal habeas corpus retains its narrow role." *Ibid.* Moreover, AEDPA mandates that federal courts "shall not" grant habeas relief "unless" its conditions are met. 22 U.S.C. § 2254. Satisfying AEDPA's conditions thus "d[oes] not guarantee relief."

52

*Davenport*, 142 S. Ct. at 1524. Even if a petitioner "overcomes all of the[ ] limits" imposed by AEDPA and by existing habeas precedent, "he is never entitled to habeas relief." *Ramirez*, 142 S. Ct. at 1731. He must still demonstrate that granting relief is an "appropriate exercise of equitable discretion" by "persuad[ing]" the court that "'law and justice require' relief." *Davenport*, 142 S. Ct. at 1524 (quoting 28 U.S.C. § 2243).

This defeats petitioner's argument that courts lack "authority to deny habeas relief to petitioners who have made the precise showing" AEDPA requires. Pet. Br. 38. It also undermines his related argument that AEDPA's "silence as to innocence" leaves a factual innocence requirement without "textual basis." Pet. Br. 36. AEDPA "left intact the equitable discretion traditionally invested in federal courts by preexisting habeas statutes." *Davenport*, 142 S. Ct. at 1524. Congress did not need to codify a factual innocence requirement in AEDPA—the statute preserved the courts' authority to adjust the scope of the writ. This view aligns with the fact that judicially crafted habeas limits coexist with AEDPA. *E.g.*, *Ramirez*, 142 S. Ct. at 1731 ("AEDPA imposes several limits on habeas relief, *and [the courts] have prescribed several more*.") (emphasis added). In recognizing courts' authority to impose additional limitations, the Supreme Court has stressed that AEDPA "sets forth a precondition to the grant of habeas relief," "not an entitlement," and

"limited rather than expanded [its] availability." *Fry v. Pliler*, 551 U.S. 112, 119 (2007).

Petitioner also notes that Congress "impose[d] an innocence requirement" (modeled on the Supreme Court's miscarriage-of-justice doctrine) in §§ 2244(b)(2)(B) and 2254(e)(2)(B) of AEDPA for "procedurally defaulted claims." Pet. Br. 37. In petitioner's view, that shows Congress barred application of a similar requirement elsewhere. *Id.* at 36-37. But the Supreme Court has rejected that precise view. A decade ago, the Court explained that "Congress did not simply incorporate the miscarriage of justice exception into §§ 2244(b)(2)(B) and 2254(e)(2)." *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013). Rather, those provisions "modif[ied]" and "constrained" the exception that developed in pre-AEDPA caselaw. *Id.* at 395, 396. AEDPA thus did not "preclude courts from applying" the exception in other contexts based on "the equitable discretion of habeas courts." *Id.* at 392, 396 (quotations omitted).

Petitioner's reading of AEDPA ignores the Supreme Court's admonition "not [to] construe" AEDPA "to displace courts' traditional equitable authority absent the clearest command." *Holland*, 560 U.S. at 646 (quotations omitted). It also conflicts with the well-established principles that the statute "plac[es] more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state

54

prisoners," *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003), and should be read to advance "principles of comity, finality, and federalism," *Williams v. Taylor*, 529 U.S. 420, 436 (2000). A factual innocence requirement advances those aims. Petitioner's reading does not.

3. A factual innocence requirement also furthers § 2243's directive that courts "entertaining an application for" habeas "shall … dispose of the matter as law and justice require." This open-ended "command"—along with Congress's "silence" on the writ's "scope" and permissive description of the habeas power—"authoriz[es]" federal courts to "adjust the scope of the writ" to suit "equitable and prudential considerations." *Danforth*, 552 U.S. at 278. Above all else, law and justice should reflect the "central purpose" of the justice system: "convict[ing] the guilty and free[ing] the innocent." *Herrera v. Collins*, 506 U.S. 390, 398 (1993). Requiring petitioner to make a colorable showing of factual innocence furthers this aim.

Habeas "is an extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system." *Davenport*, 142 S. Ct. at 1524 (quotations omitted). It is "not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03. For several reasons, a factual innocence requirement helps to ensure that, consistent with these overriding principles, federal habeas "afford[s] relief" only to those "grievously wronged." *Brecht*, 507 U.S. at 637.

55

*First*, a factual innocence requirement ensures that habeas relief is reserved for the most deserving petitioners—those who are not actually guilty of their crimes. A factual innocence requirement serves "the central purpose of any system of criminal justice"—"convict[ing] the guilty and free[ing] the innocent." *Herrera*, 506 U.S. at 398; *see Stone*, 428 U.S. at 490 ("[T]he ultimate question of guilt or innocence … should be the central concern in a criminal proceeding."). It respects the States' "powerful and legitimate interest in punishing the guilty," *Davenport*, 142 S. Ct. at 1523, while maintaining habeas as a "safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty." *Stone*, 428 U.S. at 491 n.31.

*Second*, a factual innocence requirement ensures that habeas relief is reserved for "extreme malfunctions in the state criminal justice system," *Davenport*, 142 S. Ct. at 1524, and promotes "the necessity of finality." *Stone*, 428 U.S. at 491 n.31. "Finality is essential to both the retributive and the deterrent functions of criminal law," *Calderon*, 523 U.S. at 555, since "[n]either innocence nor just punishment can be vindicated until the final judgment is known," *McCleskey*, 499 U.S. at 491. It also advances the aim of rehabilitating offenders, which "demands that the convicted defendant realize that he is justly subject to sanction." *Engle*, 456 U.S. at 127 n.32 (quotations omitted). And finality aids

"victims of crime" by enabling them to "move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556.

*Third*, a factual innocence requirement promotes "the most effective utilization of limited judicial resources." *Stone*, 428 U.S. at 491 n.31. Factual innocence helps to alleviate judicial-resource concerns and benefits petitioners with bona fide claims by "separating the meritorious needles" from the "haystack" of unfounded petitions. *Davenport*, 142 S. Ct. at 1523; *see also* Henry J. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 157 (1970) (factual innocence "permit[s] the speedy elimination of most of the petitions that are hopeless" "and of others where … release of a guilty man is not required in the interest of justice").

*Fourth*, a factual innocence requirement promotes "the minimization of friction between our federal and state systems of justice" and maintains "the constitutional balance upon which the doctrine of federalism is founded." *Stone*, 428 U.S. at 491 n.31. As the Court has stressed, "[r]esort to habeas corpus, especially for purposes other than to assure that no innocent person suffers an unconstitutional loss of liberty, results in serious intrusions on values important to our system of government." *Ibid.* Factual innocence honors the state adjudicative process and demonstrates "respect" for "the centrality of the trial of a criminal case in state court," which is "the moment at which society's

57

resources have been concentrated in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Ramirez*, 142 S. Ct. at 1739 (cleaned up).

Petitioner argues that "courts have never understood Section 2243 to transfer from Congress to the courts the unbounded authority to make … sweeping changes" or "drastically constrict the scope of the writ." Pet. Br. 38. But the issue is not that § 2243 "transfer[red]" new authority to federal courts. Rather, § 2243 (along with the overall structure of the habeas statutes) reflects Congress's longstanding intent to preserve courts' authority to adjust the scope of the writ, which dates back to the common law. *Cf. Munaf*, 553 U.S. at 693 (At common law, "the writ did not issue … as of mere course, but rather required the petitioner to demonstrate why the extraordinary power of the crown should be exercised," and "even then, courts were directed to do as to justice shall appertain.") (quotations omitted). Petitioner also observes that habeas was available "without regard to … innocence" when § 2243's predecessor was enacted. Pet. Br. 39. But this simply reflects that, under the traditional understanding of habeas that then obtained, habeas courts "had no power to look beyond the judgment" made "by a court of competent jurisdiction," which "pronounce[d] the law of the case" and "pu[t] an end to the inquiry concerning fact." *Jones v. Hendrix*, 143 S. Ct. 1857, 1871 (2023) (quotations omitted). The current scope of habeas,

however, reflects significant judicial expansion from the writ's traditional function. *Davenport*, 142 S. Ct. at 1520-1524. And "what courts have created, courts can modify." *McQuiggin*, 569 U.S. at 403 (Scalia, J., dissenting).

**B.     This Court should apply a factual innocence requirement as an independent ground to dismiss petitioner's claims.**

1. Petitioner has failed to make any showing of factual innocence. He does not deny that he committed the acts underlying his rape conviction. For that reason, the district court rejected the miscarriage-of-justice exception as grounds to excuse the procedural default of his expert-funding claim. ROA.963. As the panel recognized, petitioner "at most asserts that he wasn't legally culpable under Mississippi law because of the affirmative defense of insanity." Op. 19. But "mere legal insufficiency" does not rise to the level of "factual innocence." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner has not been "grievously wronged" by a wrongful conviction. *Brecht*, 507 U.S. at 637. It would thus be an "appropriate exercise of [the court's] equitable discretion" to deny him habeas relief. *Davenport*, 142 S. Ct. at 1524.

The Court can stop there and need not fully define the scope of a factual innocence requirement to reject petitioner's claim. But if it does consider that broader issue, the Court should hold that, at a minimum,

59

factual innocence requires a colorable showing that the petitioner did not commit the conduct underlying his conviction. *Cf. Morris v. Dretke*, 90 F. App'x 62, 70 (5th Cir. 2004) ("Actual innocence means that the person did not commit the crime."). The miscarriage-of-justice doctrine provides a helpful analog to the showing required. *See supra* 54. That doctrine requires a showing of "actual innocence" consisting of "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" and that establishes "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," *Schlup*, 513 U.S. at 324, 327.

2. Finally, applying a factual innocence requirement to reject petitioner's claims does not mean that lower courts must apply the requirement in every conceivable circumstance. As the panel recognized, "certain legal errors that are deeply rooted in the writ's history" may justify habeas relief regardless of the petitioner's factual guilt or innocence. Op. 18. This accords with the "traditional understanding" of habeas whereby relief was appropriate if, for example, "the court of conviction lacked jurisdiction." *Davenport*, 142 S. Ct. at 1521. Other cases—such as those involving a complete breakdown of the criminal process resulting in a fundamentally unfair trial, *e.g.*, *Moore v. Dempsey*, 261 U.S. 86, 88-90 (1923)—also may implicate equitable and prudential

60

considerations that justify not applying a factual innocence requirement. But this is not such a case, and the Court need not explore the outer bounds of a factual innocence requirement to apply it here.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Bridgette N. Grant*
Justin L. Matheny
Anthony M. Shults
  *Deputy Solicitors General*
Bridgette N. Grant
  *Special Assistant Attorney General*
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-3680
E-mail: bridgette.grant@ago.ms.gov

*Counsel for Respondents-Appellees*

61

## CERTIFICATE OF SERVICE

I, Bridgette N. Grant, hereby certify that the foregoing brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: August 30, 2023

_s/ Bridgette N. Grant_
Bridgette N. Grant
_Counsel for Respondents-Appellees_

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32, it contains 12,892 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally-spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font, except for footnotes, if any, which have been prepared the same way except in 12-point font.

Dated: August 30, 2023

_s/ Bridgette N. Grant_
Bridgette N. Grant
_Counsel for Respondents-Appellees_